IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,  )
                            )
            Respondent,  )
                            )
        v.  )
                            )
BRIAN FRANK ALEXANDER,  )
                            )
           Appellant.  )
                            )

No. 74015-6-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: February 27, 2017

BECKER, J. — Brian Alexander appeals his conviction for second degree assault against his former girlfriend, KC. KC suffered substantial injuries while riding with Alexander in his car. At first, she reported that Alexander beat her up. Later, she recanted. She testified at trial that the injuries were the accidental result of Alexander's efforts to prevent injury when she grabbed the wheel and tried to jump out of the car. Relying on the recantation evidence, Alexander argued that he had lawfully used force in defense of self and others. Alexander now contends the trial court erroneously refused to instruct the jury on the additional defense theory that Alexander lawfully used force to prevent damage to his car. We find no abuse of discretion.

Around 10 p.m. on an August night in 2014, a woman walking through Magnuson Park observed KC coming towards her while "stumbling" and "falling." The woman saw that KC was "streaked in blood from her head" and had a gash

above her left eye. The woman offered to call for medical aid, but KC said she did not want the police to come. KC was "panicked" and was "saying that a man had beaten her and dropped her off, and she couldn't find her keys."

The woman walked with KC to a nearby apartment complex. KC went inside. About five minutes later, the woman called 911 and reported her interaction with KC, including KC's statements that she had been beaten up and did not want the police to come.

Once inside her apartment building, KC went to her neighbor's unit, where she took shots of vodka and a Valium. She then went to the unit of a different neighbor, her friend RK. KC took a sewing kit and attempted to stitch up the cut above her eye. RK observed that in addition to the cut, KC "had injuries to her leg, her neck; her ear was bleeding; one earring had been torn out" and "one eye was almost swollen shut." KC told RK that "Brian had thrown her out of a car" and "he had grabbed her by the neck and banged her face on the instrument panel of the vehicle before throwing her out of the vehicle." KC had dated Alexander on and off for several years, and was dating him at the time. RK called 911 and reported that KC had been beaten up by a man named Brian.

Police officers went to the apartment. They observed that KC was intoxicated. She told the officers that "she was accidentally punched in the face by her boyfriend." She was taken to a hospital later that night and treated for her injuries. A detective recorded an interview with KC a few days later and took pictures of her injuries. On August 22, 2014, the State charged Alexander with assault in the second degree with a domestic violence allegation.

2

In a "To whom it may concern" letter dated September 20, 2014, KC retracted what she had earlier said about the incident. According to the letter, she was having a panic attack while inside the car and hit the windshield while struggling to stop the car and get out. She said that Alexander pulled her by the neck to get her back into the car, acting with a desire to protect her, not to hurt her:

> In retrospect, I can not remember real detail as I was under the influence. In addition I was severely grieving my son . . . whom I lost last Feb. and I lost myself in tears and panic attack, unable to breathe in the car.
> In complete upset, I took control of the steering wheel so that I may get out of the car. In the midst of my panic attack, I unbuckled my seatbelt, and figured I would rather die on the highway . . . As a method of protection for the lives of myself and himself, Brian continued driving, pulling me by my neck back into the car. Again I grabbed the wheel hitting the curb and wanting to get out and hit the windshield.
> It is my belief that at no point was it Brian's intention to purposefully wound, hurt, or injure me in any way.

She reiterated these points in an interview recorded by defense counsel for Alexander.

At trial in May 2015, the State called KC as a witness. She testified that on the day in question, August 11, 2014, she spent time with Alexander, visiting friends and family. She said that while he was driving her home, she became upset and emotional and wanted to get out of the car. "I felt really panicked and claustrophobic, and I was going to jump out of the car. I took my seatbelt off. We started like wrestling. . . . He was trying to pull me back. I had the door open, and I was like grabbing at the wheel . . . . I hit my head when I pulled the wheel, and we hit the curb. I hit the windshield. . . . My seatbelt was off. I bit him. Um,

it was just a—it was just a fight of him trying to keep me in and pull me back and me wanting to jump out and die into oncoming traffic." She said Alexander, "obviously upset" with her behavior, dropped her off a few blocks from her apartment and threw her bag out of the car. She did not recall being in contact with Alexander since then except to receive a necklace that had been ripped off her neck in the struggle.

The prosecutor confronted KC with transcripts of her interview with the detective a few days after the incident. The transcripts prompted KC to recall that she did have contact with Alexander to tell him that she was not "pressing charges." The prosecutor took KC through the statements she made to the detective describing an intentional assault:

> A. So I initially said I got punched in the face twice. I don't know.
> It's a blur. We were in the car and I was bound by a seatbelt.
> Q. And?
> A. And that he pulled my hair and kept punching me in the face
> and jaw.
> Q. And go on to the next page. 2 through 4.
> A. I kept trying to get out of the car even when it was moving, and
> that just made him hit me more, and he finally stopped up the street
> from my house. . . . I'm trying to get out of the car, and he pushed
> me and I—I left. I got out. I was by that time covered in blood.
> Okay. Was the car still moving? No. Okay.
> Q. Okay. 12 through 13.
> A. Oh, yeah, it was scary. It was scary enough that I just wanted
> to jump out on to the freeway.
> Q. Then 20 through 21.
> A. Um, I mean it could happen in a matter of seconds; it could
> happen in a matter of minutes. You know, once you're hit by a
> man, it goes black, you're just . . .

After going through the transcript with KC, the prosecutor asked her: "Brian hit you that night, didn't he?" KC denied it. "No, not that I believe. I mean technically, you know, there was not like direct hits." KC recalled writing her

letter of recantation and giving it to defense counsel because she was "feeling really guilty" about the statement she gave the detective. She again insisted that Alexander had been trying to protect her. "What happened in that vehicle was what is in that letter of recantation."

Alexander did not testify. His defense theory relied on KC's recantation testimony to argue that he had used only as much force as necessary to prevent KC from hurting herself or causing an accident.

Alexander proposed to instruct the jury that force is lawful not only when used in self-defense but also "when used in preventing or attempting to prevent a malicious trespass or other malicious interference with real or personal property lawfully in that person's possession, and when the force is not more than is necessary." The court determined the evidence did not support a defense of property instruction:

> THE COURT: . . . Even no matter how I construe the evidence so far, there's no evidence that [KC] was damaging the defendant's property.
>
> . . . .
>
> THE COURT: Except in a joke sense of damaging it by colliding with the windshield.
>
> [DEFENSE COUNSEL]: No, no. No, no. I'm thinking of her reaching over and grabbing the steering wheel, and that would be a malicious interference with his property, that is his vehicle, and therefore endeavoring to bring trauma or damage to that car. He has a right to protect his proprietary interest in that vehicle.
>
> THE COURT: No. I do not believe that somebody has the right to beat somebody else to prevent them from grabbing the steering wheel. It would be different perhaps if he found her bashing the car with a hammer. All I can really say is he may have legitimately and arguably feared for his own life or hers. I think that's all that's at issue, not damage to the car.
>
> . . . .
>
> [DEFENSE COUNSEL]: She grabbed the wheel though, your Honor. . . . Her statements were, then I turned my attention to

the steering column, grabbed at the wheel, and things erupted or got more—

THE COURT: Yeah. I'm just not with you on that. I'm with you on, I was afraid I was going to die or she was, but I'm not with you on, I was afraid my car might get scratched or something. It's just not going to do it for me.

Okay. Onward to—but your concerns are noted. Okay. I'm definitely not going to be instructing on malicious mischief or—

[DEFENSE COUNSEL]: Trespass.

THE COURT: —damage to property on this record.

The jury convicted Alexander. His principal argument on appeal is that the court erred by refusing to give the proposed instruction on preventing lawful use of force to prevent malicious interference with property.

The use of force on the person of another is not unlawful when used "by a party about to be injured . . . in preventing or attempting to prevent . . . a malicious trespass, or other malicious interference with real or personal property lawfully in his or her possession, in case the force is not more than is necessary." RCW 9A.16.020(3). "Malice" means "an evil intent, wish, or design to vex, annoy, or injure another person." RCW 9A.04.110(12). Malice may be inferred from "an act done in willful disregard of the rights of another, or an act wrongfully done without just cause or excuse, or an act or omission of duty betraying a willful disregard of social duty." RCW 9A.04.110(12).

A criminal defendant is entitled to an instruction on his or her theory of the case if some evidence supports the instruction. State v. Werner, 170 Wn.2d 333, 336-37, 241 P.3d 410 (2010).

We review de novo a refusal to give a proposed jury instruction if the refusal was based on a ruling of law. State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998). If the refusal was based on a factual dispute, we review for

● ●

an abuse of discretion. <u>Walker</u>, 136 Wn.2d at 772. Here, Alexander does not contend, and the record does not suggest, that the trial court misunderstood the law. The issue is whether the court abused its discretion by determining there was no evidence to support the instruction offered by Alexander.

The State contends there was no evidence that KC acted with malicious intent to harm the car. We agree. The alleged assault occurred in Alexander's car while he was driving. KC testified that when she unbuckled the seatbelt and tried to get out of the moving vehicle, Alexander used force to protect her from harm by pulling her back in. She consistently portrayed her state of mind inside the car as emotional and upset. While a jury might infer that KC was trying to crash the car when she grabbed the steering wheel, nothing in her testimony suggests that she was trying to harm the car as distinct from harming herself or Alexander.

Alexander cites a portion of cross-examination by defense counsel in which KC was asked, "Upon reflection back, is it your perception that your behavior could have brought trauma not only to Mr. Alexander and his vehicle but to others on the roadway?" She replied, "Absolutely." This excerpt shows that KC later realized that damage to the car was among the potential consequences of grabbing the steering wheel, but it does not support characterizing her conduct that night as a "malicious" interference with the car.

In any event, the jury convicted Alexander of intentional assault despite having been correctly instructed on self-defense and defense of others. On this record, the jury could not have reasonably found that Alexander used lawful force

7

to protect his car once they found he did not use lawful force to protect himself and KC. We conclude the court did not abuse its discretion in refusing to give the requested instruction.

Alexander contends the court abused its discretion in admitting the 911 calls placed by the two witnesses who first encountered KC after she got out of Alexander's car. This argument was not adequately preserved. The court considered whether to admit the calls during a hearing on motions in limine, and Alexander at that time stated that he was not aware of an objection he could raise. In addition, the testimony from these witnesses that was most damaging to Alexander was their live testimony at trial. Even assuming the 911 calls were hearsay, as Alexander now argues, he has not persuasively identified how he was prejudiced by their admission.

Alexander contends the court abused its discretion by allowing the detective and one of the other officers to testify, based on their training and experience, that KC's facial injuries were consistent with being punched in the face rather than with hitting the windshield. Witnesses may not testify as to the guilt of defendants, either directly or by inference. State v. Olmedo, 112 Wn. App. 525, 530, 49 P.3d 960 (2002), review denied, 148 Wn.2d 1019 (2003). Here, the officers were not offering an opinion that Alexander was guilty of assault. Their testimony was properly based on their experience with car accidents. The most significant witness on this issue was the emergency room physician. He testified without objection that the severe bruising around KC's eyes could have been caused by hitting a windshield but was more consistent

with being punched. In view of his testimony, we cannot conclude that the outcome of the trial would have been different if the officers' testimony had been excluded.

Affirmed.

Becker, J.

WE CONCUR: